UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
JEAN BAILEY
CARMEN RIVERA
                        Plaintiffs                    **Index No. 0711559**

                                                      **SECOND
                                                      AMENDED
                                                      COMPLAINT**
          v.                                          **JURY TRIAL DEMANDED**
LUTHERAN MEDICAL CENTER,
SUNSET PARK HEALTH COUNCIL, INC.
                   Defendants

--------------------------------------------------------X

## COMPLAINT

Plaintiffs Jean Bailey and Carmen Rivera, by their attorney Reid Rodriguez & Rouse, LLP, complaining of the Defendants, respectfully alleges as follows:

## JURISDICTION AND VENUE

This action arises under:

A. The provisions of Title I of ERISA section 502(a) (2) & (3), 29 U.S.C. section 1132(a) (2) & (3), as hereinafter more fully appears. Exclusive jurisdiction is conferred on this Court by ERISA section 502(e) (i), 29 U.S.C. section 1132 (e) (1). Jurisdiction is specifically conferred upon this United States District Court by the aforementioned federal statutes, as well as by 28 U.S.C. sections 1331, 1343, and under the doctrine of pendent jurisdiction. Absent jurisdiction under sections 1331 and 1343, this action could have been commenced in a court of the United States pursuant to section

28 U.S.C. Section 1332 because the matter of controversy exceeds the sum of $50,000.00, exclusive of interest and costs, and the parties are citizens of different states.

B. Plaintiffs also seek damages from the defendants for the violation of certain New York State statutes and the common law, all arising out of the same or similar set of facts, so that they form part of the same case or controversy, over which this Court has supplemental jurisdiction under 28 U.S.C. section 1367, as follows.

   (i)  New York State Labor Law section 190 et seq.

   (ii) Breach of Contract; and

   (iii) Tortious Interference with Contract

Each defendant either maintains an office, transacts business, has an agent, or is found in the County of New York, which is within the jurisdiction of the United States District Court, Southern District of New York; thus this Court has venue in this litigation pursuant to ERISA section 502(e)(2) & (3), 29 U.S.C. section 1132(e)(2) & (3).

## STATEMENT OF CLAIM

1. Plaintiff Jean Bailey (hereinafter, "Plaintiff" or " Bailey"), a licensed psychologist whose date of birth is June 24, 1951,  is jointly employed by Defendant Lutheran Medical Center (hereinafter "Defendant" or "LMC") and with its affiliate Defendant Sunset Park Health Council, Inc. (hereinafter "Defendant" or "SPHC") in the Sunset Terrace Family Health Center at 514-49th Street, Brooklyn, New York 11220.

2. Plaintiff Carmen Rivera (hereinafter, "Plaintiff" or " Rivera"), a licensed psychologist whose date of birth is July 2, 1952, is jointly employed with Defendant Lutheran Medical Center (hereinafter "Defendant" or "LMC") and with its affiliate Defendant Sunset Park Health Council, Inc. (hereinafter "Defendant" or "SPHC") in the Sunset Terrace Family Health Center at 514-49th Street, Brooklyn, New York 11220.

3. The Sunset Terrace Family Health Center treats many patients with serious mental illnesses.

4. Each plaintiff is, and at all times relevant to this action, was, a "participant" in defendant's LMC's retirement plan as defined by 29 U.S.C. section 1002(7), and has a vested right to benefits under defendant's LMC's retirement plan.

5. Defendant LMC is a corporation doing business in the State of New York, and at all times mentioned in this complaint to this action is an employer engaged in an industry affecting commerce within the meaning of 29 U.S.C. section 1002(5)(12).

6. Defendant SPHC is a corporation doing business in the State of New York, and after June 30, 2007 has been an employer engaged in an industry affecting commerce within the meaning of 29 U.S.C. section 1002(5)(12).

7. Defendant LMC is a "plan sponsor", 29 U.S.C. section 1002 (16)(A) of Lutheran Medical Center Health Services Retirement Plan (hereinafter "HSRP"), a pension trust fund established pursuant to and in accordance

with the requirements of 29 U.S.C. section 186 (Section 302 of the Labor-Management Relations Act of 1947.)

8.  In New York City during the summer of 1984 there was a 44 day city-wide strike by workers of New York's Health & Human Service Union 1199/ SEIU now known as 1199SEIU United Healthcare Workers East (hereinafter "1199") against the League of Voluntary Hospitals and Homes of New York, of which defendant LMC was a member institution.

9.  The 44-day stoppage, which was at the time was the largest and longest health care strike in New York City history,  involved 52,000 employees, 18,000 patients, and 45 private, nonprofit hospitals and nursing homes.

10. The hospitals were temporarily crippled and hit hard financially.

11. All LMC's clinicians (i.e., therapist, social workers, psychologists including Plaintiff Bailey, who was a member of 1199 as a staff psychologist) in the Sunset Park Mental Health Clinic were out on strike.

12. At the time, there were only the Chef Psychologist Dr. Giuseppe Constantino, the psychiatrists, and the secretarial staff, who were not in the union, working in the clinic during the strike.

13. The clinic's delivery of mental health services were severely restricted by the strike as many of the patients were severely mental ill.

14. Furthermore, the secretaries were deployed to the hospital to perform food service work, maintenance work, etc, in the main hospital located 150 55th Street.

15. Because there was a skeletal staff at 49th street, patients could receive medication and no other services.

16. The remaining psychologist and social work staff positions remained in the union.  At the time of the strike, Dr. Constantino was the Chef Psychologist and the only psychologist not in the union.

17. Anthony Pietro Pinto was the Medical Director of the Clinic at the time of the 1984 strike.

18. Dr. Constantino invited the Plaintiff Bailey in late August 1986 to his office on the second floor at the Sunset Park Mental Health Clinic at 514 49th Street.

19. At the time Plaintiff Bailey, who commenced employment with Defendant LMC on July 1, 1980, was the Child Psychologist at the Sunset Park Mental Health Clinic with the most seniority, and was well-liked by the staff and an opinion leader at the Clinic.

20. In their discussion, Dr. Constantino asked the Plaintiff Bailey to relinquish her union position of Staff Psychologist and accept the appointment to a newly created non-union position of Coordinator of Child and Adolescent Services.

21. Dr. Constantino told Plaintiff Bailey that LMC wanted to create more middle management position in the Sunset Park Mental Health Clinic to prevent future crippling of services in the event of another strike.

22. Specifically, in addition to Plaintiff Bailey's position of Coordinator of Child Adolescent Services, LMC created the nonunion positions of Senior

Psychologist, Social Worker Supervisor, and Coordinator of Day Treatment.

23. The issue of parity with union clinicians was the focal point of the discussion between Dr. Constantino and Plaintiff Bailey with respect to whether she would resign her union position and accepting the nonunion position of Coordinator of Child Adolescent Services.

24. Plaintiff Bailey specifically expressed concerns to Dr. Constantino about giving up union protections, salary increases, pension rights, benefits, adverse actions, and vacations.

25. Dr. Constantino represented to Plaintiff Bailey that she would have parity with the union members in these areas and told her, "Don't worry about it, my friend. Whatever the Union receives, you will receive".

26. Dr. Giuseppe Constantino acting within the scope and course of his duties and responsibilities promised Plaintiff Bailey in their meeting in August 1984 that if she left the union position and accepted the nonunion position of Coordinator of Child Adolescent Services, she would have absolute parity with 1199 union members with respect to Plaintiffs' pay, pension, benefits, and job protections.

27. Defendant LMC'S Medical Director Giuseppe Constantino had real and apparent authority to make the promise to Plaintiff Bailey on behalf of Defendant LMC.

28. In exchange for and reliance upon Dr. Constantino's promises, plaintiff Bailey resigned her 1199 position with Defendant LMC and accepted the

nonunion position of Coordinator of Child Adolescent Services effective October 1, 1986.

29. When plaintiff Bailey resigned her 1199 position with Defendant LMC and accepted the nonunion position of Coordinator of Child Adolescent Services effective October 1, 1986, she was a member of the HSRP, which had both 1199 and nonunion members.

30. Dr. Constantino recruited Plaintiff Carmen Rivera from an 1199 union position with the Maimonides Medical Center ("Maimonides") to commence employment as a staff psychologist with Defendant LMC in the Sunset Park Mental Health Clinic in June 1986.

31. Prior to accepting her position with LMC, Plaintiff Rivera turned down a nonunion position with New York Medical Center and a non 1199 union position with Lincoln Hospital, because she valued her union membership in 1199.

32. On or about October 1987, Dr. Constantino met with Plaintiff Rivera and Dr. Alice Aviles, who was a licensed staff psychologist with a 1199 union position, to his office on the second floor at the Sunset Park Mental Health Clinic at 514 49th Street.

33. Dr. Constantino asked Drs. Rivera and Aviles to resign their union positions of staff psychologists and accept the newly created nonunion position of Senior Psychologist.

34. Dr. Constantino informed Dr. Rivera that in the position of Senior Psychologist she would receive the same pay increases that the 1199

union members received and that her pension and benefits would be as good as that of that the 1199 union members.

35. As she highly valued her 1199 membership, Dr. Rivera immediately on that same day went to the office of Sunset Park Mental Health Clinic Administrator Heriberto Cruz and asked him to verify the statements made to her by Dr. Constantino that in the position of Senior Psychologist she would receive the same pay increases that the 1199 union members received and that her pension and benefits would be as good as that of that the 1199 union members.

36. Sunset Park Mental Health Clinic Administrator Heriberto Cruz acting within the scope and course of their duties and responsibilities reiterated on the same day Dr. Constantino's statements to Plaintiff Rivera that in the position of Senior Psychologist she would receive the same pay increases that the 1199 union members received and that her pension and benefits would be as good as that of that the 1199 union members.

37. Dr. Giuseppe Constantino and Clinic Administrator Heriberto Cruz were acting within the scope of their duties and had real and apparent authority to state to represent to Plaintiff Rivera that in the position of Senior Psychologist she would receive the same pay increases that the 1199 union members received and that her pension and benefits would be as good as that of that the 1199 union members.

38. In exchange for and reliance upon Dr. Constantino's promises, plaintiff Rivera, who trusted Dr. Constantino and considered him her mentor,

resigned her nonunion position of Staff Psychologist with Defendant LMC and accepted the nonunion position of Senior Psychologist, effective November 29, 1988.

39. When plaintiff Rivera resigned her 1199 position with Defendant LMC and accepted the nonunion position of Senior Psychologist effective November 29, 1988, she was a member of the HSRP, which had both 1199 and nonunion members.

40. The requests and promises made by Defendant LMC'S Medical Director Giuseppe Constantino and Clinic Administrator Heriberto Cruz were made in the course of dealings between plaintiffs and defendant LMC, and were intended to and did induce the plaintiffs' reliance. Defendant LMC'S Medical Director Giuseppe Constantino and Clinic Administrator Heriberto Cruz had real and apparent authority to make the requests and promises.

41. Effective October 1, 2001, defendant LMC sponsored the Lutheran Medical Center 403(b) Retirement Plan.

42. Plaintiffs did not discover that defendant LMC sponsored the Lutheran Medical Center 403(b) Retirement Plan (hereinafter the "403(b) Plan") until July 29, 2008.

43. Effective January 31, 2003, the HSRP was amended, to freeze the future benefits of all LMC non-union employees participating in the HSRP on that date, except for Non-Union Nursing Employees.

44. Defendant LMC informed plaintiffs that LMC would provide retirement benefits to the affected non-union employees though the Lutheran Medical Center 401(k) Plan ("401(k) Plan").

45. The employee illustrations regarding the purported benefits of the 401(k) plan were misleading.

46. They created with unrealistic expectations, on the premise that the investment return would be paid at the unprecedented rate of either 6% or 9% annually.

47. There was no mention in the illustrations of the possibility of having lower investment returns or negative investment returns, and what impact such lower or negative investment returns would have on the employee's pension.

48. The HSRP was a defined benefit plan where all the investment risks was borne by the employer.

49. Defendant LMC did not explain the fact that all of the investment risk were now being shifted from LMC, to the LMC non employees, including plaintiffs.

50. Defendant LMC did not provide the plaintiffs with the mandated Summary Plan Description with respect to the 401(k) Plan nor did they give the plaintiffs access to the mandated 401(k) Plan document.

51. The Collective Bargaining Agreement ("CBA") executed between the League of Voluntary Hospitals and Homes of New York and 1199 for the period May 1, 2002  through June 1, 2004 provided that 1199 union

members would earn $750 lump sum upon ratification of the ("CBA") and a cumulative wage total wage increase of 15.97 percent, as follows (i) five percent in the first year, (ii) four percent compounded increase as of June 1, 2003, and another four percent compounded as of June 1, 2004.

52. Plaintiffs did not receive a four percent compounded increase as of June 1, 2003, and another four percent compounded as of June 1, 2004 from either defendant.

53. The Collective Bargaining Agreement executed between the League of Voluntary Hospitals and Homes of New York and 1199 for the period June 1, 2004 through July 1, 2007 provided that 1199 union members would earn a cumulative wage total wage increase of 12.55 percent.

54. Plaintiffs did not receive a cumulative wage total wage increase of 12.55 percent for the period June 1, 2004 through July 1, 2007 from either defendant.

55. The Collective Bargaining Agreement executed between the League of Voluntary Hospitals and Homes of New York and 1199 for the period December 1, 2007 through December 1, 2010 provided that 1199 union members would earn a cumulative wage total wage increase of 12.55 percent, as follows (i) three percent across the board increase as December 1, 2007, (ii) three percent compounded increase as of December 1, 2009; (iii) three percent, and (iv) three percent as of December 1, 2010. .

56. Plaintiffs did not receive a three percent across the board increase as of December 1, 2007 from either defendant.

57. As of July 23, 2005, Defendant LMC unilaterally ceased directing Plaintiff Bailey's salary deferrals into a tax sheltered annuity program exempted from Title I of ERISA under DOL Regulation 2510.3-2(f) and written through Royal Globe Life Insurance Company for Life and Health Insurance Company of New York ("NANY").

58. As of July 23, 2005, Defendant LMC unilaterally ceased directing Plaintiff Rivera's salary deferrals into a tax sheltered annuity program exempted from Title I of ERISA under DOL Regulation 2510.3-2(f) and written through Fidelity.

59. Defendant LMC continued to direct salary referrals of 1199 union members into LMC's 403(b) Plan.

60. In June 2007 Sunset Terrace Family Health Center's Administrative Director of Behavioral Health Michael Lardiere informed plaintiffs that effective July 2007, Defendant SPHC would employ them.

61. Mr. Lardiere further informed plaintiffs that the change would not affect their jobs, responsibilities or salaries.

62. Consequently, commencing July 2007 plaintiffs' paychecks were issued by Defendant SPHC, whereas before the paychecks were issued by Defendant LMC.

63. Plaintiffs continued to use LMC designated Identification cards and business cards.

64. Plaintiff Bailey received a "Disciplinary Action" letter dated 10/23/07 which served as a "final warning" by Sunset Terrace Family Health Center's Administrative Director of Behavioral Health Tomas Cruz for one (i) school treatment plan charting deficiency cited by the State Office of Mental Health auditors during their 9/24/07 and 9/26/07 audit.

65. In 28 years of service and after thousands of charting entries this was the first charting deficiency ever cited by an auditor with respect to Plaintiff Bailey, who have had charts included in more than 100 audits.

66. A "final warning" could not have been issued to an 1199 union member for a first offense of this kind under the Collective Bargaining Agreement.

67. On 3/18/08 the State Office of Mental Health auditors returned to Sunset Terrace Family Health Center and this time cited 2 more school charts for treatment plan deficiencies.

68. Two SPHC licensed psychologists, 1199 union members, were called to a meeting with Mr. Cruz on 3/19/08.

69. Plaintiff Bailey was present at that meeting and witnessed Mr. Cruz reassure these psychologists that the meeting was "NOT a disciplinary meeting" and so no union representation was needed.

70. Despite the fact that their charting deficiencies, like those of Plaintiff Bailey, cost the Clinic 6 months on its operating certificate the two licensed psychologist were simply encouraged to "do better next time".

71. In June 2008, Mr. Cruz asked that supervisors contribute their thoughts and ideas on increasing productivity.

72. Plaintiff Bailey presented some general statistical findings at the 6/17/08 Supervisors' Meeting, indicating where numbers were up and where Sunset Terrace Family Health Center needed to improve.

73. Later that same day Plaintiff suggested to Mr. Cruz that a colleague's 19 encounters generated in a single day was exceptional and certainly sets the standard for future performance.

74. Mr. Cruz agreed to follow up and Plaintiff Bailey left for vacation.

75.   Upon her return from vacation, Plaintiff Bailey learned that on 7/1/08 at general staff meeting, Mr. Cruz announced that an investigation into billing for collateral visits was being conducted by LMC's legal department.

76. At the staff meeting, Mr. Cruz denied that he had anything to do with the investigation, i.e. [he] did not look for this information, it was put on his desk.

77. Colleagues of Plaintiff Bailey of many years have stopped looking or speaking to her.

78. One of Plaintiff Bailey's professional colleagues and friends, who apparently is being investigated, told an LMC social worker,   "People around here are shooting themselves in the foot".

79.   And Mr. Cruz' secretary told her co-worker, "I don't know why Jean would make a report like that. Did she want to get those women in trouble?"

80. Plaintiff Bailey never mentioned billing of any kind to Mr. Cruz in her presentation to him on 6/18/08.

81. Plaintiff Bailey only mentioned her colleague's 19 encounters in the context of improving overall productivity.

82. Plaintiff Bailey has no access to the actual encounter forms or the dates of billing.

83. During Plaintiff Bailey's 7/22/08 LMC interview regarding the billing investigation, the LMC lawyers incorrectly presumed that Plaintiff Bailey had spoken specifically to Mr. Cruz about more than one colleagues encounter form.

84. Defendants' conduct with regard to the billing investigation has created a hostile work environment for Plaintiff Bailey, as LMC and SPHC management has created the incorrect impression that she has "blown the whistle" on colleagues for alleged wrongdoing and have done nothing to alleviate the hostile work environment despite Plaintiff Bailey's complaints.

85. By correspondence dated May 5, 2008, Plaintiffs, through counsel, wrote the HSRP Plan Administrator and requested that Plaintiffs benefit accruals be immediately resumed, retroactively. To the date of their freezing.

86. By correspondence dated May 6, 2008, Plaintiff Bailey, through counsel, wrote the Plan Administrator of the 403(b) Plan and requested, inter alia, that her eligibility to participate in the 403(b) plan be restored immediately.

87. By correspondence dated July 28, 2008 LMC's President and CEO Wendy Goldstein responded to Plaintiffs counsel letter dated May 5, 2008, and stated, inter alia, that the future benefit accruals in the HSRP remain frozen as of January 31, 2003.

88. By correspondence dated July 29, 2008 LMC's President and CEO

Wendy Goldstein responded to Plaintiffs counsel letter dated May 6, 2008,

and stated, inter alia, that Plaintiff Bailey made salary deferrals into a tax

sheltered annuity program exempted from Title I of ERISA under DOL

Regulation 2510.3-2(f) through July 23, 2005 and after that date no

deferrals were made by Plaintiff Bailey after that date.

89. By correspondence dated July 29, 2008 LMC's President and CEO

Wendy Goldstein responded to Plaintiffs counsel letter dated May 6, 2008,

and stated, inter alia, that defendant LMC also sponsors the Lutheran

Medical Center 403(b) Plan, which is governed by ERISA.

**FIRST CAUSE OF ACTION-**
**VIOLATIONS OF TITLE I OF THE EMPLOYEE RETIREMENT INCOME**
**SECURITY ACT OF 1974 (ERISA)**
**(29 U.S.C. SEC 1001 et seq.)**
**(Against LMC)**

90. Plaintiffs repeat and reallege each and every allegation in paragraphs

numbered "1" through " 89" of this complaint with the same force and

effect as is fully set forth herein.

91. A copy of this second amended complaint will be mailed to the U.S.

Secretary of Labor and the U.S. Secretary of the Treasury, as required by

ERISA section 502(h), 20 U.S.C. section 1132(h), and as required by New

York State Law, to the Attorney General of the state of New York.

92. Defendant LMC is a deemed, actual, or named fiduciary under ERISA

section 3(21)(A)(i) and (ii), 29 U.S.C. section 1002 (21) (A)(i) and (ii).

93. Defendant LMC's misrepresentations to Plaintiffs regarding parity with 1199 union members with respect to Plaintiffs' pensions have caused the Plaintiffs to lose substantial retirement benefits.

94. Defendant LMC's , as more fully set forth herein, has breached its fiduciary duties, with respect to the HSRP, which such duties must be exercised solely in the interest of plan participants.

95. Defendant LMC's agent Dr. Giuseppe Constantino representation to Plaintiff Bailey in their meeting in his office in August 1984 that if she left the union position and accepted the nonunion position of Coordinator of Child Adolescent Services, she would have absolute parity with 1199 union members with respect to Plaintiff Bailey's pension, and benefits was not as he represented it to be, (b) he did not have the confidence in the accuracy of his representation that he stated or implied, or (c) he did not have the basis for his representation that he stated or implied,  in that the HSRP had not been amended to provide that Plaintiff Bailey would have absolute parity with 1199 members with regard to her rights and benefits under the HSRP and  oral representations are insufficient to alter the pension benefits set forth in the HSRP document.

96. Dr. Constantino's made the above representations for the purpose of inducing the Plaintiff Bailey to rely upon them and to take action or refrain from taking action in reliance thereon, and the Plaintiff Bailey did justifiably rely upon and take action upon or refrain from taking action in reliance upon representations to her detriment.

97. More specifically, Plaintiff Bailey had closely questioned Dr. Constantino about the issue of parity with 1199 members if she left 1199, and only left her 1199 position and accepted the nonunion position after Dr. Constantino assured her that she would receive parity with respect to her 1199 members with respect to her pension.

98. Defendant LMC's agent Dr. Constantino's representation to Plaintiff Rivera in their meeting in his office in October 1988 that if she left the 1199 position of Staff Psychologist and accepted the nonunion position of Senior Psychologist , she would have absolute parity with 1199 union members with respect to Plaintiff Rivera's pension, and benefits was not as he represented it to be, (b) he did not have the confidence in the accuracy of his representation that he stated or implied, or (c) he did not have the basis for his representation that he stated or implied,  in that the HSRP had not been amended to provide that Plaintiff Bailey would have absolute parity with 1199 members with regard to her rights and benefits under the HSRP and  oral representations are insufficient to alter the pension benefits set forth in the HSRP document.

99. Dr. Constantino's made the above representations for the purpose of inducing the Plaintiff Rivera to rely upon them and to take action or refrain from taking action in reliance thereon, and the Plaintiff Bailey did justifiably rely upon and take action upon or refrain from taking action in reliance upon representations to her detriment.

100.    More specifically, Plaintiff Rivera had closely questioned Dr.

Constantino about the issue of parity with 1199 members if she left 1199,

and only left her 1199 position and accepted the nonunion position after

Dr. Constantino assured her that she would receive parity with respect to

her 1199 members with respect to her pension.

101.    Defendant LMC's agent Clinic Administrator Heriberto Cruz

representation to Plaintiff Rivera in their meeting in his office in October

1988 that if she left the 1199 position of Staff Psychologist and accepted

the nonunion position of Senior Psychologist , she would have absolute

parity with 1199 union members with respect to Plaintiff Rivera's pension,

and benefits was not as he represented it to be, (b) he did not have the

confidence in the accuracy of his representation that he stated or implied,

or (c) he did not have the basis for his representation that he stated or

implied,  in that the HSRP had not been amended to provide that Plaintiff

Bailey would have absolute parity with 1199 members with regard to her

rights and benefits under the HSRP and  oral representations are

insufficient to alter the pension benefits set forth in the HSRP document.

102.    Clinic Administrator Heriberto Cruz made the above representations for

the purpose of inducing the Plaintiff Rivera to rely upon them and to take

action or refrain from taking action in reliance thereon, and the Plaintiff

Rivera did justifiably rely upon and take action upon or refrain from taking

action in reliance upon representations to her detriment.

103.   More specifically, Plaintiff Rivera had closely questioned Clinic

Administrator Heriberto Cruz about the issue of parity with 1199 members

if she left 1199, and only left her 1199 position and accepted the nonunion

position after Clinic Administrator Heriberto Cruz reiterated f Dr.

Constantino's representation that if she left her 1199 position and

accepted the nonunion position she would receive parity with respect to

her 1199 members with respect to her pension.

104.   Defendant LMC by its misrepresentations have failed, as fiduciaries, to

comply with the "Prudent Man Standard of Care" under ERISA 404(a)(1),

29 U.S.C. section 1104(a)(1), to discharge its duties "solely in the interest

of the participants by inducing the plaintiffs to make a decision which will

substantially reduce their retirement benefit.

105.   The foregoing is a violation of ERISA's fiduciary liability rule.

106.   Plaintiffs seek damages, plus reasonable attorneys' fees and the costs

of this action, in an amount as the Court in its discretion deems

appropriate pursuant to ERISA.

## SECOND CAUSE OF ACTION
## BREACH OF NEW YORK LABOR LAW

107.   Plaintiffs repeat and reallege each and every allegation in paragraphs

numbered "1" through "106" of this complaint with the same force and

effect as is fully set forth herein.

108.   Commencing on February 1, 2003 Defendant LMC stopped awarding

the Plaintiffs salary increase to maintain parity with those awarded the

1199 members promised that defendant LMC promised the Plaintiff when they left their 1199 positions.

109.    Although the 1199 CBA for the period May 1, 2002 through June 1, 2004 provided that 1199 union members would earn four percent compounded increase as of June 1, 2003, and another four percent compounded as of June 1, 2004,  Plaintiffs did not receive a four percent compounded increase as of June 1, 2003, and another four percent compounded as of June 1, 2004 from defendant LMC.

110.    Although the 1199 for the period June 1, 2004 through July 1, 2007 provided that 1199 union members would earn a cumulative wage total wage increase of 12.55 percent, Plaintiffs did not receive a cumulative wage total wage increase of 12.55 percent for the period June 1, 2004 through July 1, 2007 from defendant LMC.

111.    Although the 1199 for the period the period December 1, 2007 through December 1, 2010 provided that 1199 union members would earn a cumulative wage total wage increase of 12.55 percent, as follows (i) three percent across the board increase as December 1, 2007, (ii) three percent compounded increase as of December 1, 2009; (iii) three percent, and (iv) three percent as of December 1, 2010,Plaintiffs did not receive a three percent across the board increase as of December 1, 2007 from either defendant.

112.    Defendants' willful failure and refusal to pay plaintiff wages and benefits due and owing to plaintiff is a violation of the New York Labor Law section 190 et seq..

113.    As a result of the foregoing, the plaintiffs have been denied wages, and have incurred damages thereby.

### THIRD CAUSE OF ACTION-BREACH OF CONTRACT

114.    Plaintiffs repeat and reallege each and every allegation in paragraphs numbered "1" through "113" of this complaint with the same force and effect as is fully set forth herein.

115.    By and through defendant LMC's oral assurances on which the Plaintiffs relied and for which the Plaintiffs gave adequate consideration by resigning from 1199 and continuing to work, defendant LMC created a contract with each Plaintiff.

116.    Commencing on February 1, 2003 Defendant LMC stopped awarding the Plaintiffs salary increase to maintain parity with those awarded the 1199 members promised that defendant LMC promised the Plaintiff when they left their 1199 positions.

117.    Although the 1199 CBA for the period May 1, 2002 through June 1, 2004 provided that 1199 union members would earn four percent compounded increase as of June 1, 2003, and another four percent compounded as of June 1, 2004, Plaintiffs did not receive a four percent compounded increase as of June 1, 2003, and another four percent compounded as of June 1, 2004 from defendant LMC.

118.    Although the 1199 for the period June 1, 2004 through July 1, 2007 provided that 1199 union members would earn a cumulative wage total wage increase of 12.55 percent, Plaintiffs did not receive a cumulative wage total wage increase of 12.55 percent for the period June 1, 2004 through July 1, 2007 from defendant LMC.

119.    Although the 1199 for the period the period December 1, 2007 through December 1, 2010 provided that 1199 union members would earn a cumulative wage total wage increase of 12.55 percent, as follows (i) three percent across the board increase as December 1, 2007, (ii) three percent compounded increase as of December 1, 2009; (iii) three percent, and (iv) three percent as of December 1, 2010, Plaintiffs did not receive a three percent across the board increase as of December 1, 2007 from either defendant.

120.    When Defendant SPHC In June 2007 Sunset Terrace Family Health Center's Administrative Director of Behavioral Health Michael Lardiere, acting within the scope of his employment with defendant SPHC, informed plaintiffs that effective July 2007, Defendant SPHC would employ them, but the change would not affect their jobs, responsibilities or salaries., defendant SPHC ratified defendant LMC's contract with Plaintiffs to afford them parity with 1199 members.

121.    Defendants did not afford plaintiff Bailey parity with respect to 1199 members job protection in October 2007 when defendants issued plaintiff

Bailey a final warning for an infraction in which comparably situated 1199 members were not disciplined.

122.    Defendants did not afford plaintiff Bailey parity with respect to 1199 members job protection in  July 2008 when defendants failed to correct plaintiff Bailey's hostile working environment created by defendant's actions.

123.    In failing to pay Plaintiffs with absolute parity with 1199 union members with respect to Plaintiffs' pay, Defendants breached their contract with the Plaintiffs causing the to suffer lost wages and consequential damages.

124.    In failing to afford the Plaintiff Bailey with absolute parity with 1199 union members with respect to job protections, Defendants breached their contract with the Plaintiff Bailey causing her to suffer pain and suffering, emotional distress and consequential damages.

**FOURTH CAUSE OF ACTION**
**TORTIOUS INTERFERENCE WITH CONTRACT BY LMC**

125.    Plaintiffs repeat and reallege each and every allegation in paragraphs numbered "1" through " 124" of this complaint with the same force and effect as is fully set forth herein.

126.    Plaintiff Bailey had an existing contract with NANY to invest and manage Plaintiff's salary deferrals into a tax sheltered annuity program.

127.    Defendant LMC was aware of the existence of the NANY contract.

128.    Due to the wrongful and fraudulent act of defendant LMC, Plaintiff Bailey's contract with NANY was interfered.

129.    The acts of LMC were wrongful and was the reason for Plaintiff
Bailey stopping her salary deferrals into a tax sheltered annuity program
with Fidelity.

130.    Plaintiff Rivera had an existing contract with Fidelity to invest and
manage Plaintiff's salary deferrals into a tax sheltered annuity program.

131.    Defendant LMC was aware of the existence of the Fidelity contract.

132.    Due to the wrongful and fraudulent act of defendant LMC, Plaintiff
Rivera's contract with Fidelity was interfered with.

133.    The acts of LMC were wrongful and was the reason for Plaintiff
Bailey stopping her salary deferrals into a tax sheltered annuity program
with Fidelity.

134.    As a result of the foregoing the Plaintiffs have been damaged in the
reduction of the amount of their tax deferred annuity available upon
retirement.

## PRAYER

Plaintiffs pray that this court:

(i)    Assume jurisdiction of this case;

(ii)    Award Plaintiffs full legal and equitable relief under ERISA, including,
damajes, prejudgment interest, etc.;

(iii)    Award Plaintiffs compensatory damages for the value of the lost
income,  emotional distress, and pain and suffering;

(iv)    Award Plaintiffs punitive damages, liquidated damages, attorneys fees
and costs; and

(v)     Award all other and further relief as the Court may deem is just and

necessary.

## JURY DEMAND

Plaintiffs request a jury trial on all issues triable by jury.

Respectfully submitted,

_____/s/_____
Gregory L. Reid, Esq. (GR-7489)
Reid Rodriguez & Rouse, LLP
Attorney for Plaintiffs
1285 Avenue of the Americas
Suite 3513
New York, New York 10019
(212) 554-4417

Dated: August 1, 2008

New York, New York

# REID RODRIGUEZ & ROUSE, LLP

1285 AVENUE OF THE AMERICAS
SUITE 3513
NEW YORK, NEW YORK 10019
TELEPHONE (212) 554-4417
FACSIMILE (212) 554-4089

**Electronically Filed**                                                    August 2, 2008
Clerk of the Court
United States District Court, Southern District of New York
500 Pearl Street, Room 735
New, New York 10007

**Re:**   **Bailey et al v. Lutheran Medical Center, 07 CV  11481 (PAC)**
          **Statement Explaining Delay in CM/ECF Filing of Amended Complaint**

Dear Ladies and Gentlemen:

       We represent the plaintiffs in the above-styled matter. On August 1, 2008 at
approximately 10:00 p.m., plaintiffs' counsel attempted to file an Amended Complaint in
the above-styled matter on the CM/ECF system to comply with the July 30, 2008 Order
of The Honorable Paul A. Crotty that plaintiffs' Amended Complaint be filed by August
1, 2008. However, due to technical issues or malfunction with respect to the CM/ECF
operation, plaintiffs' counsel was unable to complete the filing of the Amended
Complaint on August 1, 2008.

                                        Very truly yours,


                                        /s/
                                        Gregory L. Reid (GR-7489)